**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 19-cv-03465-RM-SKC

DESCHENES CONSULTING LLC, and
JOSHUA DESCHENES,

      Plaintiffs,

v.

NU LIFE MARKET L.L.C., and
EARL ROEMER,

      Defendants.

---

**ORDER RE:
DEFENDANTS' MOTION TO DISMISS AND
PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS**

---

This Order addresses Defendants' Motion to Dismiss and Memorandum in Support Thereof [#29][1] ("Defendants' Motion") and Plaintiffs' Motion to Dismiss Counterclaims [#40] ("Plaintiffs' Motion"). Defendants' Motion seeks dismissal of the Frist Amended Complaint ("FAC"). [#20.] Plaintiffs' Motion seeks dismissal of Defendants' Counterclaims. [#28.] The Court reviewed the Motions, all related briefing, the entire record, and applicable law. No hearing is necessary. For the following reasons, the Court GRANTS in part and DENIES in part both Motions.

---

[1] The Court uses "[#___]" to refer to specific docket entries in CM/ECF.

## A. BACKGROUND[2]

### 1.    Allegations in the FAC

The Parties are before the Court because an otherwise successful contractual relationship eventually soured and fermented into litigation. In September 2013, Defendant Nu Life Market, L.L.C. ("Nu Life") retained Plaintiff Joshua Deschenes as its National Sales Director. [#20 at ¶29.] The Contract provided Nu Life would pay Mr. Deschenes "$4,000 per month plus 2% gross retail and ingredient sales dollars generated by [him] and the sales team" (the "2013 Contract"). [*Id.* at ¶30.] At some point, Nu Life began paying and contracting with Plaintiff Deschenes Consulting LLC ("Deschenes Consulting"), a Colorado LLC, for the services Mr. Deschenes performed.

In 2015, Nu Life increased the monthly salary payable to Deschenes Consulting to $5,750. [*Id.* at ¶31.] Additionally, Nu Life agreed to pay Deschenes Consulting "2% of sales (FOB Scott City, Kansas facility) generated by Deschenes Consulting, Rachel Klataske, and designated brokers." [*Id.*] Subsequently, in October 2016, Deschenes Consulting's title changed to VP of Sales and Marketing for Nu Life. [*Id.* at ¶33.]

In 2019, Mr. Deschenes was expecting the birth of his second child. Based on familial medical history, he was concerned about the health of his wife and unborn child and expressed these concerns to Nu Life's President, Earl Roemer. [*Id.* at ¶¶73-75.] Mr. Deschenes and Mr. Roemer frequently travelled together for work and discussed their respective families. [*Id.* at ¶¶69-71.]

---

[2] The Court accepts the well-pleaded facts as true and views the allegations in the light most favorable to the non-movants. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010).

On September 15, 2019, Mr. Deschenes informed Mr. Roemer of his second child's birth, disclosed the child was experiencing medical complications and had been placed in the Neonatal Intensive Care Unit (NICU). [*Id*. at ¶76.] On September 19, 2019, Mr. Roemer requested Mr. Deschenes travel to Nu Life's office in Kansas. [*Id.* at ¶78.] Once it was safe for him to leave his wife and newborn alone, Mr. Deschenes travelled to Kansas on October 7, 2019. [*Id*. at ¶80.] Upon his arrival, Mr. Roemer handed Mr. Deschenes a letter terminating his employment (or contract) with Nu Life. [*Id*. at ¶81.] The termination letter specified Deschenes Consulting was being paid the full October flat rate retainer in the amount of $5,750. [*Id*. at ¶83.] It also instructed Plaintiffs to "Please have your accountant invoice accounts payable for all outstanding shipped orders as of October 7, 2019 and Nu Life Market will pay the 2% sales commission on those shipped orders." [*Id*. at ¶84.]

After his termination, Mr. Deschenes remotely accessed Nu Life's on-line system to determine the gross amount of shipped orders as of October 7, 2019. [*Id*. at ¶¶87 and 93.] He then emailed Mr. Roemer estimated amounts due and owing Plaintiffs. [*Id*. at ¶89-90.] Further, Mr. Deschenes estimated the outstanding gross amount of all sales generated by Deschenes Consulting and its team, which Nu Life had not yet paid. [*Id*. at ¶¶92-93.] To determine this amount, he again accessed Nu Life's on-line computer system as he had no other means to estimate how much Nu Life owed. [*Id*.] Mr. Deschenes estimated this new unpaid amount to be $100,000; he alleges Nu Life has failed to pay him these amounts. [*Id*. at ¶95.]

As a result of accessing Nu Life's on-line system after his termination, Mr. Deschenes alleges Nu Life and Mr. Roemer threatened him with criminal prosecution and claimed his behavior constituted criminal theft. [*Id*. at ¶¶99-100.] Specifically, Plaintiffs allege, upon information and belief, counsel for Defendants sent a cease and desist letter on behalf of Mr. Roemer and Nu Life. [*Id*. at ¶¶101-03.] The letter claimed Mr. Deschenes' actions in accessing Nu Life's computer system constituted criminal theft under Kansas law and threatened to report Mr. Deschenes "recent theft to the appropriate criminal authorities." [*Id*. at ¶¶101-02.] Plaintiffs also allege Mr. Roemer, through his attorney, threatened to bring the issue to the attention of the Scott County (Kansas) sheriff unless Mr. Deschenes signed an agreement. [*Id*. at ¶104.] Mr. Deschenes alleges the draft agreement would have made it impossible for him to continue working in the same industry. [*Id*. at ¶¶105, 107-08.] Mr. Deschenes declined to sign the agreement, however, he alleges he considered the restrictions in the agreement and the pressure from Defendants to sign the agreement as a direct threat to his ability to find subsequent employment in the food or food product-related industry. [*Id*.]

Plaintiffs, individually and collectively, brought four claims against Nu Life and Mr. Roemer, also individually and collectively. [Id. at pp.15-20.] Specifically, Deschenes Consulting brought breach of contract and breach of implied covenant of good faith and fair dealing claims against Nu Life; Plaintiffs brought a claim under Colo. Rev. Stat. § 8-2-113(1) against Nu Life and Mr. Roemer; and Mr. Deschenes brought a claim for extreme and outrageous conduct against both Nu Life and Mr. Roemer.

2.    **Counterclaim Allegations**

Nu Life has asserted five Counterclaims. [#28.] These include conversion, breach of contract, misappropriation of trade secrets, unjust enrichment, and a claim for an injunction. [*Id*. at pp.21-31.] In relevant part, Nu Life avers prior to Plaintiffs' October 7, 2019 discharge, it had numerous conversations with Mr. Deschenes regarding his sub-par sales performance. [*Id*. at ¶8.] It further alleges Mr. Deschenes repeatedly accessed and exported Nu Life information from its cloud-based system over the course of a few days after his discharge. [*Id*. at ¶¶11-12.] Subsequently, attorneys for Nu Life made numerous demands for Plaintiffs to return all Nu Life company materials, but Plaintiffs have failed to do so. [*Id*. at ¶¶14-15.] Instead, Mr. Deschenes utilized the information he obtained to contact Nu Life customers. [*Id*. at ¶¶17-18.] Nu Life reported this theft of company information to local law enforcement authorities in Kansas. [*Id.* at ¶16.]

### B. LEGAL STANDARDS

1.    **Fed. R. Civ. P. 12(b)(2)**

Mr. Roemer seeks dismissal, in part, under Fed. R. Civ. P. 12(b)(2) alleging a lack of personal jurisdiction over him. The purpose of a motion to dismiss under Rule 12(b)(2) is to determine whether a court has personal jurisdiction over a defendant. The plaintiff bears the burden of establishing personal jurisdiction. *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988). "Where, as in the present case, there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a *prima facie* showing that jurisdiction exists." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th

Cir. 2020) (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)). The plaintiff may survive a motion to dismiss by presenting evidence (either uncontested allegations in its complaint or other materials, or an affidavit or declaration) "that if true would support jurisdiction over defendant." *Id.* (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998)). "[A]ny factual disputes in the parties' affidavits must be resolved in plaintiffs' favor." *Id.*

**2.    Fed. R. Civ. P. 12(b)(6)**

The parties each seek dismissal of the claims against them under Fed. R. Civ. P. 12(b)(6). Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The *Twombly/Iqbal* pleading standard requires courts take a two-prong approach to evaluating the sufficiency of a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678– 79 (2009).

The first prong requires the court to identify which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or are mere "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678. The second prong requires the court to assume the truth of the well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "Accordingly, in examining a complaint under Rule 12(b)(6), [courts] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). In other words, the court strips the

complaint bare of the deficient allegations and determines whether, what is left, plausibly states a claim for relief.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. at 678 (internal quotation marks omitted). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard requires more than the sheer possibility that a defendant has acted unlawfully. *Id*. If the allegations "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, (10th Cir. 2008) (quoting *Twombly*, 550 at 570). The standard is a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

### C. DISCUSSION

### 1.    Defendants' Motion

Defendants challenge the FAC's sufficiency on two bases. First, they argue the Court must dismiss all claims against Mr. Roemer for lack of personal jurisdiction. [#29 at pp.6-9.] They also argue all claims warrant dismissal for failure to state a claim. [*Id.* at pp.9-17.]

### a.    Personal Jurisdiction over Mr. Roemer

Plaintiffs bring two claims against Mr. Roemer, violation of Colo. Rev. Stat. § 8-2-113(1) and the tort claim of extreme and outrageous conduct. [#20 at ¶¶131-45.] A plaintiff establishes personal jurisdiction over a nonresident-defendant in a diversity action by demonstrating "jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the [D]ue [P]rocess [C]lause of the Fourteenth Amendment." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999)). "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-472 (1985) (quoting *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 319 (1945)). Because Colorado's long-arm statute extends as far as the constitutional limits of the Due Process Clause, the court has jurisdiction over defendants coextensive with the Due Process Clause. *Benton*, 375 F.3d at 1075; *Keefe v. Kirschenbaum & Kirschenbaum, P.C.*, 40 P.3d 1267, 1270 (Colo. 2002).

Here, Plaintiffs concede the Court does not have general personal jurisdiction over Mr. Roemer. [#29 at p.4.] Therefore, the Court need only address whether it has specific personal jurisdiction over him. Plaintiffs argue specific personal jurisdiction applies based on Mr. Roemer's, and his agents, intentional acts giving rise to their claims.

Specific jurisdiction may be exercised where the defendant has "purposefully directed" his activities toward the forum jurisdiction and where the underlying action is

based upon activities arising out of or relating to the defendant's contact with the forum. *SEC v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 (1985)). For a defendant to be subject to specific jurisdiction, the court must determine: "(1) whether the defendant purposefully availed himself of the privilege of conducting business in the forum state, and (2) whether the litigation arises out of the defendant's forum-related contacts. *Found. for Knowledge in Dev. v. Interactive Design Consultants*, 234 P.3d 673, 678 (Colo. 2010) (quoting *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1194 (Colo. 2005). The touchtone inquiry is whether "the defendant has 'purposefully directed' his activities toward the forum jurisdiction." *Wise v. Lindamood*, 89 F. Supp.2d 1187, 1190 (D. Colo. 1999).

In considering these factors, the Court reviewed FAC, which includes as attachments: (1) the 2015 Contract; (2) information including articles regarding Nu Life's products; (3) October 7, 2019 Termination Letter; (4) October 18, 2019 Cease and Desist Letter; and (5) Post Hoc Non-Compete Agreement ("Draft Agreement"). The Court finds Plaintiffs have failed to make a *prima facie* showing that specific personal jurisdiction exists over Mr. Roemer.

The FAC alleges Mr. Roemer is a citizen of Kansas and he resides there. [#20 at ¶11.] In conclusory fashion, it alleges the court has personal jurisdiction over Mr. Roemer pursuant to Colorado's long-arm statute, and that he has directed tortious conduct toward Plaintiffs in the state of Colorado [*Id*. at ¶¶15-16.] But the FAC is devoid of allegations to plausibly allege Mr. Roemer purposefully availed himself of the privilege of conducting

business here, or to plausibly allege their claims arise out of Mr. Roemer's forum-related contacts.

For example, unlike the defendant in *Foundation for Knowledge*, Plaintiffs have not alleged Mr. Roemer made telephone calls, sent emails or letters, or travelled to Colorado with regularity, if at all. *Id.,* 234 P.3d at 679. Instead Plaintiffs focus solely on whether this litigation arises out of Mr. Roemer's forum-related contacts. In this regard, they argue the Court has specific personal jurisdiction over Mr. Roemer because he "purposefully directed his activities at residents of the forum, and the litigation results from the alleged injuries that arise out of or relate to those activities." [#29 at p.3.]

In support of this argument, Plaintiffs cite two cases for the proposition negligent conduct in a foreign state causing injury in Colorado may be deemed an act committed in Colorado for purposes of the long-arm statute. But in *Scheuer*, relied on by Plaintiffs, the alleged tortfeasor, a New Mexico attorney, placed numerous telephone calls to a Colorado resident, mailed file notes and billing statements to Colorado, and received funds from Colorado for his services, all in support of a claim the lawyer-defendant negligently disbursed funds from his trust account. *Scheuer v. District Court of Denver*, 684 P.2d 249, 251 (Colo. 1984). Here, the FAC lacks sufficient allegations to plausibly allege Mr. Roemer's purposeful availment of the privilege of conducting business in Colorado, or that their claims against him arise from any of his forum-related contacts. [3]

---

[3] Plaintiffs assert the cease and desist letter sent to them was at the direction of Mr. Roemer. Even assuming that's true (Mr. Roemer disputes it by his affidavit), a lone cease and desist letter is insufficient to establish Mr. Roemer's purposeful availment in this case, and it only touches upon the second inquiry concerning whether the dispute arises from his forum-related contacts. *Wise*, 89 F. Supp.2d at 1191 ("The dispute in this case results

Further, in *Goettman*, also relied on by Plaintiffs, the auto accident causing injury to the Colorado plaintiff occurred in Colorado while the defendant's employee was traveling there on work-related business, which included work to be performed in Colorado. *Goettman v. N. Fork Valley Rest.,* 176 P.3d 60, 69-70 (Colo. 2007). Here, the FAC alleges Mr. Roemer terminated Plaintiffs' services while they all were in Kansas. While Plaintiffs argue they experienced the injury in Colorado, the FAC plainly alleges the blow was struck against them in Kansas [#20 at ¶¶80-81.]

Without more, neither *Scheuer* nor *Goettman* support specific personal jurisdiction under these bare-bones allegations. While the burden to make a *prima facie* showing of personal jurisdiction is light, a pleader remains obliged to support a claim with sufficient factual allegations to allow the court to draw the reasonable inference the Court's jurisdiction is proper. Here, Plaintiffs have not alleged sufficient facts to plausibly allege specific personal jurisdiction over Mr. Roemer. The FAC fails to allege enough facts concerning whether Mr. Roemer purposefully availed himself of the privilege of conducting business in the forum state. Nor did any information submitted by Plaintiffs outside the FAC nudge this issue from the conceivable to the plausible. The Claims against Mr. Roemer are dismissed for lack of personal jurisdiction.[4]

---

from the alleged tortious conduct of the plaintiff. . . . It does not result from the two cease and desist letters.").

[4] Having concluded Plaintiff failed to establish the first inquiry, the Court does not address whether the claims against Mr. Roemer arise from his forum-related contacts or whether subjecting him to Colorado's jurisdiction is reasonable. And for reasons argued by Defendants, the Court does not find Mr. Roemer's litigation-related contacts associated with this case gives rise to personal jurisdiction over him.

**b.    Failure to State a Claim**

As an initial matter, the Court notes Plaintiffs do not oppose dismissal of their claim for breach of the implied covenant of good faith and fair dealing. Accordingly, that claim is dismissed. The remaining claims are addressed in turn, below.

**i.    Breach of Contract**

A party attempting to recover for breach of contract must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). The FAC plausibly alleges a breach of contract claim. It specifically alleges: (1) the existence of the 2015 Contract obligating Nu Life to pay Plaintiffs a 2% commission on certain sales; (2) Plaintiffs development of customers, sales, and new business on behalf of Nu Life; (3) Nu Life's breach of the 2015 Contract by failing to pay monies owed under the agreement; and (3) damages. [#20 at ¶¶95, 120-23.]

Defendants argue the terms of the 2015 Contract "make clear that a sale did not occur for the purposes of Plaintiffs' commissions until the order was shipped." This argument is unavailing because it is based on Defendants' interpretation of the contract, which, not surprisingly, is inapposite Plaintiffs' interpretation. And because the argument is premised on contractual interpretation, it ignores the allegations in the complaint, which plausibly allege a breach of contract claim. Indeed, Defendants do not dispute the existence of the 2015 Contract between the parties; they merely dispute its interpretation

or application to the facts raised in the FAC. The Court denies Defendants' Motion to Dismiss to the extent it seeks dismissal of the breach of contract claim.

### ii. Violation of Colo. Rev. Stat. § 8-2-113(1)

The subsection of the statute Plaintiffs have sued under reads: "It shall be unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit." Colo. Rev. Stats. § 8-2-113(1); *OmniMax International, Inc. v. Anlin Industries, Inc.*, No. 18-cv-01830-DDD-MEH, 2019 WL 2516121, at *2 (D. Colo. June 17, 2019) ("The statute in question declares it unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit."). Defendants argue the Court should dismiss this claim because the purported Post Hoc Non-Compete Agreement ("Draft Agreement") between the parties is not a non-competition agreement, but instead, a draft pre-suit agreement to protect confidential information during settlement negotiations. In the alternative, they say if it is a non-competition agreement, it is valid under the trade secrets exception of Colo. Rev. Stat. § 8-2-113(2). Defendants also argue the Draft Agreement is not valid because Plaintiff never signed it.

In the FAC, Plaintiffs pleaded Defendants threatened to, and made a criminal complaint against them, attempted to force them to sign the Draft Agreement, and threatened criminal prosecution if they did not sign the Draft Agreement. They also construe the Draft Agreement to be a non-competition agreement because its terms effectively prevented Plaintiffs from working in the food or food product industry. Plaintiffs argue the Draft Agreement's broad language included matters not protected as trade

secrets, and that, because they are bringing the claim under subsection one of § 8-2-113, and not subsection two, the trade secret exception does not apply.

Each sides' discussion and analysis of this claim is tortured and wrought with red herrings. To plausibly allege a claim under this statute and its subsection one, the FAC must contain enough facts to establish (1) force, threats, or other means of intimidation, which (2) prevented Plaintiffs from engaging in a lawful occupation anywhere. Colo. Rev. Stat. § 8-2-113(1). First, the Court does not find the Draft Agreement, in and of itself, to constitute a force, threat or other means of intimidation in support of alleging this statutory claim. The FAC alleges Plaintiffs never signed it [#20 at ¶135], and had they done so, it likely would have triggered application of subsection two of the statute, which Plaintiffs state they are not suing under.

Second, the FAC alleges Defendants: "threatened and intimidated Plaintiffs by, among other things, pressuring Joshua to sign the Post Hoc Non-Compete Agreement, which would prevent Plaintiffs from working in the food or food product industry;" "threatened Joshua with criminal prosecution if he did not sign the Post Hoc Non-Compete Agreement;" and, "attempted to bully Plaintiffs into signing" the agreement which was "exceedingly broad." [#20 at ¶¶132-34 (emphasis added).] But it also alleges Plaintiffs never signed the agreement. [*Id.* at ¶135.] Thus, the FAC ultimately alleges threats and bullying by Defendants to induce Plaintiffs to sign a contract they chose not to sign. Even still, the FAC alleges "Plaintiffs have limited their search for employment, fearful that attempts to secure employment with a food or food product company would result in further threats and means of intimidation by Defendants." [*Id.* at ¶136.]

The Court does not believe these allegations afford Plaintiffs a private cause of action under § 8-2-113(1). There are apparently no Colorado decisions with direct guidance on whether a party may seek damages for an improper threat under § 8-2-113(1). *See OmniMax Int'l, Inc.*, 2019 WL 2516121, at *3. Thus, the district court in *OmniMax Int'l* resorted to Colorado principles of statutory interpretation to determine whether the statute provided a private cause of action under the facts presented in that case. *Id.* There, District Judge Domenico held:

> . . .Section 113 does not clearly afford the Defendants, under the circumstances presented here, a cause of action for damages. It is worth emphasizing that the Court is not deciding whether there are ever any potential circumstances in which a damages action for violation of Section 113[1] might succeed. But the alleged intimidation here relates entirely to threatening to withhold bonuses if Clark and Applegate did not sign the Agreements. (See Countercl. ¶¶ 45, 54–55.) The question before the Court is therefore limited to whether Colorado law provides a right to sue for damages based on such allegations where the employees entered covenants, continued their employment, and received all benefits they were due.

*Id.* Because the alleged damages in *OmniMax Int'l* flowed from Plaintiffs being induced to enter non-competition agreements with their employer in exchange for bonuses, which were paid, the court determined the threats and intimidation to sign the agreements did not "lead to any damage other than that allegedly caused by the [non-competition] Agreement themselves." *Id.* Likening the plaintiffs' claim under § 8-2-113(1) to one essentially alleging the plaintiffs signed the non-competition agreements under duress, the court found these harms are protected by general contract law with remedies in claims for rescission or voidability of the agreements. *Id.* at *4. "Absent any authority indicating otherwise, the Court cannot say that the Colorado legislature intended to upend these

common, privately accessible equitable principles by tacitly authorizing statutory damages in circumstances where the law has dependably afforded only equitable remedies." *Id.* Finally, observing the statute's historical underpinnings in the labor movement and codes involving blacklisting, picketing, and publishing notices of boycott, the court noted "there are today criminal penalties in place to discipline (and therefore deter) violations of the provision in question." *Id.* (citing Colo. Rev. Stat. § 8-2-115). The court ultimately found the circumstances in the *OmniMax Int'l* case did not permit the court to infer Colorado's legislature clearly expressed its intent to create a cause of action for damages under § 8-2-113(1). *Id.*

The same analysis and conclusion apply here. The FAC alleges threats, intimidation, and bullying by Defendants to induce Plaintiffs to sign a non-disclosure or non-competition agreement. The FAC further alleges Plaintiffs never signed the agreement despite the threats. Instead, it alleges damages flowing from the threats in the form of Plaintiffs self-limiting their job search to avoid "employment with a food or food product company" out of fear of more threats. [#20 at ¶135.] The only threats alleged in the FAC are threats and intimidation to force Plaintiffs to sign the Draft Agreement, which, according to the FAC, "would prevent Plaintiffs from working in the food or food product industry." [*Id. at* ¶¶132-34.] Thus, had Plaintiffs signed the Draft Agreement they would have had remedies in contract law and under § 8-2-113(2) to void or rescind the agreement. *See* Colo. Rev. Stat. § 8-2-113(2); *OmniMax Int'l*, *supra*.

But since the damage Plaintiffs claim is self-imposed limitations on their job search, out of fear of being threatened again to sign the Draft Agreements, they have an available

equitable remedy; they could seek a declaratory judgment that they are not required to sign, or are not bound by, the terms of the Draft Agreement or other purported limitations Defendants seek to impose on them. *See* 28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129-30 (2007) (discussing the application of the Declaratory Judgment Act to situations where a plaintiff's self-avoidance of imminent injury is coerced by threats of another, and applying the Act where a patent licensee's ongoing payment of royalties was coerced by the threat of the licensee having to pay treble damages if it stopped payments and the patent was ultimately upheld). For these reasons, the Court does not find the legislature intended to provide a private cause of action under the circumstances here, where Plaintiffs did not sign restrictive covenants and instead self-imposed limitations on their job search out of fear of being threatened into signing those restrictive covenants or fear of litigation. *See, e.g., OmniMax Int'l*, *supra*.

The Motion to Dismiss is granted insofar as dismissal of this claim is concerned.

### iii.   Intentional Inflection of Emotional Distress

The elements of the tort of extreme and outrageous conduct, also known as intentional infliction of emotional distress ("IIED"), are: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff incurred severe emotional distress that was caused by the defendant's extreme and outrageous conduct. *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994). Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the court must

initially rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficiently outrageous as a matter of law: "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting *Culpepper*, 877 P.2d at 883). Liability for IIED has been found only where the conduct has been so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Coors Brewing*, 978 P.2d at 666 (quoting *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970)).

Relevant here, the FAC alleges:

76. Joshua informed Mr. Roemer that the Deschenes' second child had medical complications and was placed in the NICU unit of the hospital.

77. After Joshua's newborn daughter was released from the NICU unit on September 18, 2019, she continued to be under close watch for a possible return to the hospital in light of continued medical complications. Mr. Roemer knew about these continued medical complications, and Mr. Roemer knew about Joshua's high level of concern for the health of his newborn daughter.

78. Despite his knowledge that Joshua's wife had just gone through a difficult, complicated pregnancy, that the couple's infant daughter had been in the NICU unit of the hospital with serious medical conditions, that the newborn continued to be closely monitored, and that Joshua was significantly concerned about his wife's and daughter's health, on September 19, 2019 – four days after the birth of Joshua's daughter and on the day after Joshua's newborn daughter was released from the hospital – Mr. Roemer requested that Joshua travel from Colorado to Nu Life's offices in Scott City, Kansas.

[#20.]

The FAC goes on to allege Mr. Deschenes was unable to travel to Kansas when Mr. Roemer requested, so instead, he waited until his wife and newborn were released from the hospital. [*Id.* at ¶¶79-80.] When he finally travelled to Kansas on October 7, 2019, Mr. Roemer handed Mr. Deschenes a termination letter upon his arrival. [*Id.* at ¶81.] The termination letter expressed appreciation for Mr. Deschenes' years of service, explained the October retainer payout Nu Life was making to Plaintiffs, and asked Mr. Deschenes to please have his accountant invoice any accounts payable. [*Id.* at ¶¶81-84.] It also alleges Mr. Roemer offered to write a reference letter for Mr. Deschenes. [*Id.* at ¶86.] Finally, relevant to the IIED claim, it alleges Defendants, through counsel, threatened Mr. Deschenes with criminal prosecution in both Colorado and Kansas because Mr. Deschenes accessed Nu Life's online system after his employment termination. [*Id.* at ¶99.]

The FAC fails to plausibly allege conduct that is sufficiently outrageous as a matter of law. This is particularly true in light of the FAC's allegations that Mr. Deschenes did not travel to Kansas until his wife and newborn were released from the hospital, Defendants thanked him for his service, they paid his retainer and offered to pay his accounts payable, and offered to write him a reference letter. These allegations are inapposite those cases where the conduct alleged is distinctly outrageous. *See Apodaca v. Colorado Nonprofit Dev. Ctr.*, No. 16-cv-00383-MSK-STV, 2017 WL 2869407, at *4 (D. Colo. April 4, 2017) (employer discharged an employee while on sick leave after undergoing a partial hysterectomy to remove cancerous cells); *Christen-Loper v. Bret's Elec., LLC*, 175 F. Supp.3d 1213, 1226 (D. Colo. 2016) (employer discharged plaintiff for taking time off to

visit her doctor and did so while plaintiff was lying in a hospital bed after suffering a severe bi-polar episode and while under a suicide watch); *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499-500 (Colo. App. 2002) (employer discharged plaintiff while he was on sick leave recuperating from a heart condition and did so by entering his home and handing him his termination notice while he lay in bed).

Based on the allegations in the FAC, the Court concludes reasonable people could not differ on the question of whether Defendants' alleged conduct was outrageous. Accordingly, Plaintiff's IIED claim is dismissed.

### 2. Plaintiffs' Motion to Dismiss Counterclaims

#### i. Conversion

Under Colorado Law, the common-law tort of conversion consists of: (1) the defendant exercising dominion or control; (2) over the property of another; and (3) without the owner's authorization. *915 Labs, LLC. V. Peterson*, No. 17-cv-02430-MSK-MJW, 2018 WL 2301837, at *2 (D. Colo. May 19, 2018) (citing *Itin v. Ungar*, 17 P.3d 129, 135 n. 10 (Colo. 2000)). Conversion does not require a tortfeasor act with the intent to permanently deprive the owner of her property. *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1199 (Colo. App. 2009) (citing *Sauffer v. Stegemann*, 165 P.3d 713, 717 (Colo. App. 2006)); Restatement (Second) of Torts § 22A(1) (1965) ("conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.")

The Conversion Counterclaim alleges Plaintiffs' conversion of sales orders, notes, leads, reports sales by account, as well as Nu Life's customer lists. [#28 at ¶¶12, 13.] The claim alleges Mr. Deschenes accessed these materials remotely and he "repeatedly accessed and exported company information from Nu Life." [*Id.* at ¶¶10-12, 20-21.] The Conversion Counterclaim does not allege Nu Life has been deprived of its use of these materials, but instead alleges it has suffered damages, its documents have been compromised, and Plaintiffs "continue to use Nu Life's company information for their own benefit in contravention of Nu Life's business interests." [*Id.* at ¶27.]

In *915 Labs*, a case cited by Defendants, the defendant "seized control of the domain, emails servers, and email accounts used by [plaintiffs] and locked them out." *915 Labs*, 2018 WL 2301837, at *2. As noted above, the Conversion Counterclaim here does not allege Plaintiffs accessed Nu Life's system and locked Nu Life out.

A case with facts analogous to the current matter is further instructive. *See Internet Archive v. Shell*, 505 F. Supp.2d 755, 762 (D. Colo. 2007). In *Internet Archive*, the plaintiff website owner alleged conversion against an internet archive organization. *Id*. In granting defendant's motion to dismiss, then Chief Judge Babcock held plaintiff failed to allege facts showing defendant exercised dominion or control over her website because she continued to own and operate the website while it was archived on defendant's system. *Id*.

Like the conversion claim in *Internet Archive,* the Conversion Counterclaim here does not plausibly allege the requisite control or dominion over Nu Life's information to support a conversion claim because it fails to allege Plaintiffs' actions deprived Nu Life of

its own access or use of the "converted" materials or sufficient interference with Nu Life's right to control. This claim is dismissed.

### ii.  Breach of Contract Counterclaim

The Motion to Dismiss is denied as to this Counterclaim for the same reasons Defendants' Motion to Dismiss is denied concerning Plaintiffs' breach of contract claim. The Breach of Contract Counterclaim contains sufficient facts to plausibly allege a breach of contract. [#28 at ¶¶ 29-37.] The parties' competing arguments involve their differing interpretations of the contract or its application to the facts. The question before the Court at this stage is not whose interpretation of the alleged contract is correct, the question is whether the Breach of Contract Counterclaim alleges sufficient facts to plausibly allege a state a claim. It does. [*Id.*]

### iii.  Misappropriation of Trade Secrets

In order to state a claim for misappropriation of trade secrets, a plaintiff must allege facts supporting the following elements: (1) plaintiff possessed a valid trade secret; (2) the trade secret was disclosed or used without consent; and (3) the defendant knew, or should have known, the trade secret was acquired by improper means. *RE/MAX, LLC v. Quicken Loans, Inc.*, 295 F.Supp.3d 1163, 1173 (D. Colo. 2018). The Colorado Uniform Trade Secrets Act defines a "trade secret" as:

> any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 70-74-102(4).

The Counterclaim alleges facts supporting allegations that Plaintiffs "obtained trade secrets of Nu Life" that included "production and sales processes and client lists; Nu Life acted to protect its trade secrets; Plaintiffs were and continue to be prohibited from using Nu Life's trade secrets for their own benefit; Plaintiffs intentionally and unlawfully accessed and exported Nu Life's trade secrets after they were discharged and used them; and all of this caused Nu Life damages. [*Id.* at ¶¶39-45.]

Yet again, the parties' arguments in their briefs focus on interpretation of the facts—for example, whether production and sales processes and client lists are trade secrets. At this stage, the parties are overthinking it, especially when considering the definition of "trade secret" in Colo. Rev. Stat. § 70-74-102(4). Based on the allegations referenced above, the Counterclaim contains sufficient facts to plausibly allege a claim for misappropriation of trade secrets. Plaintiffs' Motion to Dismiss is denied as to this Counterclaim.

### iv.    Unjust Enrichment

Unjust enrichment is a form of contract, or quasi-contract, implied by law that does not rely upon a promise between the parties. *Harris Group*, 209 P.3d at 1205. The elements of unjust enrichment are: (1) at the expense of a plaintiff; (2) a defendant received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it. *Id.* (citing *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008)). The scope of this equitable remedy is broad, "cutting across both contract and tort law, with its application guided by the underlying principle of

avoiding the unjust enrichment of one party at the expense of another." *Id.* It is a form of restitution designed to restore the plaintiff to their prior status. *Harris Group*, 209 F.3d at 1205 (citing Restatement (First) of Restitution § 1 (1937)).

The Court finds Nu Life has adequately pled its Counterclaim for unjust enrichment. This Counterclaim is premised on the allegations concerning Plaintiffs' access, export, and use of Nu Life's online system after their discharge. [*Id.* at ¶¶46-50.]

Plaintiffs' arguments question the benefit conferred while denying they used the downloaded material after their discharge. But those issues are not ripe for consideration at the motion-to-dismiss stage. *See Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.*, No. 13-cv-3422-WLM-CBS, 2015 WL 1041515 (D. Colo. 2015) (holding unjust enrichment claim need only allege the defendant knowingly received a benefit at the plaintiff's expense it would be unjust for the defendant to retain). Accordingly, the Court DENIES Plaintiff's Motion to Dismiss as it relates to this Counterclaim.

### v.    Permanent Injunction

A party requesting a permanent injunction bears the burden of showing: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Fisher v. Oklahoma Health Care Authority*, 335 F.3d, 1175, 1180 (10th Cir. 2003).

The Court will dismiss this Counterclaim. As alleged, the Counterclaim recites a series of legal conclusions that mirror the elements for injunctive relief without alleging facts to plausibly support those elements. [*Id.* at ¶¶52-62.]  The fact this Counterclaim

incorporates by reference other allegations in the overall Counterclaims does not change the Court's analysis.

*       *       *

Based on the above, it is ORDERED:

Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART: (1) all claims against Mr. Roemer are dismissed based on lack of personal jurisdiction and Mr. Roemer shall be dismissed as a party; (2) the claims for breach of the implied covenant of good faith and fair dealing; violation of Colo. Rev. Stats. § 8-2-113(1); and extreme and outrageous conduct are dismissed; and (3) the claim for breach of contract remains.

Plaintiffs' Motion to Dismiss Counterclaims is GRANTED IN PART and DENIED IN PART: (1) the counterclaims for conversion and injunction are dismissed; and (2) the counterclaims for breach of contract, misappropriation of trade secrets, and unjust enrichment remain.

DATED this 30th day of November, 2020.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge